# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs April 18, 2012

## STATE OF TENNESSEE v. TIMOTHY EUGENE KELLY, JR.

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1511      Steve R. Dozier, Judge**

---

**No. M2011-01260-CCA-R3-CD - Filed October 22, 2012**

---

A Davidson County Criminal Court Jury convicted the appellant, Timothy Eugene Kelly, Jr., of one count of especially aggravated robbery and two counts of fraudulent use of a credit card. The trial court imposed a total effective sentence of thirty-seven years in the Tennessee Department of Correction. On appeal, the appellant challenges the sufficiency of the evidence supporting his convictions and the sentences imposed by the trial court. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Elaine Heard, Nashville, Tennessee, for the appellant, Timothy Eugene Kelly, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

At trial, the victim, Barbara Erskine Futter, testified that around 6:00 p.m. on October 27, 2009, she and her boyfriend, Claude Todd, had dinner with friends, one of whom was Diane Gregory, at the Calypso Café. Around 7:15 or 7:30 p.m., the victim and Todd went to a Target store on White Bridge Road. Approximately fifteen minutes later, after making purchases, they left the store. In the parking lot, they encountered Gregory, and the trio

stopped to talk.

While they were talking, the victim heard a noise and looked over her left shoulder. The victim was then hit in the back, and she felt her purse being pulled from her shoulder. However, the victim was unable to see the perpetrator. Gregory ran into the store to report the incident, and Todd ran after the perpetrator.

The victim said that she stood in place, holding onto her shopping cart until Todd and Gregory returned. The victim said that she felt as if someone had hit her with a fist on her back and that she experienced a dull pain in her back. The police arrived and spoke with the victim, Todd, and Gregory. After ten or fifteen minutes, the victim needed to go inside and sit. The victim testified that she could not stand and had to hold onto a wall to walk inside the store.

As they walked down a hallway inside Target, Gregory told the victim that she saw a slit in the victim's raincoat. When they got to a room where the victim could sit, the victim pulled off her raincoat and the jacket she wore underneath. The victim's back was covered with blood, and she realized she had been wounded. A few minutes later, someone tried to push towels against her back, but the victim asked the person to stop because it was painful. Thereafter, ambulance personnel arrived and put the victim on a stretcher; the victim was unable to assist because "the pain in [her] back was so significant [she] couldn't really lean or bend or anything." The medical personnel placed the victim in an ambulance and transported her to Saint Thomas Hospital.

At the hospital, the victim was placed in a room, and a doctor told her that she had been stabbed. The victim said that the doctor's examination of the wound was "agony." The doctor determined that the wound was eight inches deep. Further testing revealed that one of the victim's kidneys had been lacerated. The victim stayed in the hospital for three days for treatment. She said that she still had a scar on the left side of her back.

The day after she was admitted to the hospital, the victim called her credit card company, informed them of the robbery, and cancelled her credit cards. A credit card company employee told her that her card had been used four times the day after her purse was stolen: once at an Exxon gas station, twice at a Fancy Nails salon, and once at a Krystal's restaurant. Additionally, on the night of the stabbing, there was an attempted use of her credit card on John E. Merritt Boulevard.

On cross-examination, the victim denied that she had suffered a "substantial risk of death." She stated that although her kidney function was "fine" at the time of trial, her kidney did not work correctly "right away" after the stabbing. The victim described the

initial pain as "a thick, heavy pain like somebody had hit you with a fist." She stated that she was unable to walk without support.

Diane Gregory testified that while she was talking with the victim and Todd in the Target parking lot, she saw a man walking from the shopping cart area. The man was wearing blue jeans, and he had a blue bandana around his face, covering his nose and mouth. Gregory said that she saw the man's face from about three feet away. The man walked behind the victim, hit her, and took her purse. When the man fled, Gregory ran into Target to get help. Thereafter, the police arrived, and everyone moved inside the store. At that time, Gregory saw that the victim's jacket was ripped and that she had been stabbed.

Gregory stated that sometime later, police brought her a photograph lineup to examine. After looking at the photographs, she identified the appellant as the perpetrator. On cross-examination, Gregory acknowledged that she had seen the appellant's eyes but no other distinguishing features. Nevertheless, she was able to quickly identify the appellant as the perpetrator.

Claude Todd testified that as he and the victim talked with Gregory in the Target parking lot, he saw a man quickly walking toward them from a service alley. The man had a bandana over his nose and mouth and a metallic object, which Todd thought was a pistol, in his hand. Todd believed the man was going to rob Target. However, the man moved behind the victim, and Todd heard the victim scream, "[W]hy did you hit me, or, you know, that's my purse." As the man left, Todd started to follow but slipped in a puddle of water.

After regaining his balance, Todd chased the perpetrator and saw him go into an alley behind either Dault's Restaurant or Calhoun's restaurant. The man got into a car that looked like a black Mustang or Trans Am, and the car sped away. Todd did not see enough of the man to be able to positively identify him; however, Todd knew the man was a black male with a slender build and height similar to Todd. Todd thought the man was a Target employee because he was wearing a red shirt. After the car left, Todd called 911 and returned to the victim.

When police arrived and the group went into Target, Todd had to assist the victim because she was weak. Gregory saw a tear in the back of the victim's coat. Todd pushed up the coat and saw that the victim's blouse was covered with blood. He also saw a cut in the victim's skin.

On cross-examination, Todd said that although he had watched the perpetrator, he was unable to identify him. Todd explained, "I got a good look at his eyes, but I was also not

-3-

trying to stare at anybody that I perceived to have a gun at that time." He also explained that he thought the object the perpetrator carried was a gun because he did not think someone would try to rob Target with a knife.

Sharhonda Cunningham testified that she knew the appellant but that she had not known him long at the time of the offenses. Cunningham acknowledged that she had previously been convicted of misdemeanor theft, but she denied that she had three other theft convictions.

Cunningham testified that on Sunday, October 25, 2009, she was a passenger in a black Mustang with the appellant and four women: Shawndraka, Alicia, Jasmine, and Ashley. The Mustang belonged to Shawndraka. Cunningham did not know the surnames of any of the females. Two days later, Cunningham saw Shawndraka's car on television news footage regarding a robbery at Target.

Cunningham said that sometime after the robbery, she spoke with the appellant on the telephone. The appellant told her that he had robbed and stabbed a woman at Target. Cunningham said that she was not with the appellant at Target.

On cross-examination, Cunningham stated that she did not know why the appellant told her about the robbery. She denied that she was familiar with the Crime Stoppers Program or that she was expecting money from the State for her testimony.

Shawndraka Goodner testified that on Sunday, October 25, 2009, she was in her dark blue Mustang with the appellant, Cunningham, Ashley, and Jasmine. Goodner did not know the last names of Ashley or Jasmine. Goodner said that Jasmine and the appellant were "together." Goodner said that on October 27, she loaned her car to Jasmine. Later that night, Goodner saw her car on a television news report regarding a robbery at Target. When Goodner spoke face-to-face with the appellant, he said that he had committed a robbery at Target.

Goodner said that on October 28, she, her mother, and Jasmine went to Fancy Nails and had their nails done. Goodner and Jasmine paid with a credit card. On cross-examination, Goodner acknowledged that she knew the card was stolen. She conceded that she initially told police she paid for the nail service with her own money.

Metropolitan Nashville Police Detective Robert Peterson said that at around 8:05 p.m. on October 27, 2009, he responded to a robbery at Target. After speaking with the victim for a while, Detective Peterson noticed that she had been stabbed. An ambulance was called, and the victim was transported to the hospital.

-4-

Detective Peterson stated that he obtained security camera footage from Target. On the video was a dark blue Mustang. Detective Peterson released a description of the vehicle to the news outlets. He then went to the hospital, spoke with the victim, and asked her to cancel her stolen credit cards. The victim did so, and Detective Peterson learned that there were unauthorized transactions on the card following the robbery. The transactions included an attempted charge at 2801 John E. Merritt Boulevard, two charges at Fancy Nails, and one charge at a Krystal's restaurant. Police were unable to obtain security video relating to the transactions. Another unauthorized charge occurred at an Exxon gas station. Detective Peterson obtained video footage that showed a black female paying for gas for a dark blue Mustang.

Detective Peterson said that on October 28, police dispatch notified him that Cunningham wanted to talk to him about the robbery at Target. When Detective Peterson interviewed Cunningham, she said that "[s]he had been riding around with [the appellant]." After the interview, Detective Peterson prepared a photograph lineup and showed it to Gregory, who was facing the perpetrator as he approached the victim. Gregory identified the appellant from the lineup.

Thereafter, Detective Peterson spoke with Goodner, who acknowledged owning a 2000 model dark blue Ford Mustang. Goodner said that on October 27, she loaned the car to Jasmine Crook. After receiving permission from Goodner, Detective Peterson searched the car. In the back seat near the "trunk area," Detective Peterson found a blue bandana. Also in the vehicle were several photographic identifications of Crook and a temporary registration plate. Detective Peterson said that the Mustang matched the vehicle on the Target security video. He stated that the video revealed that the car had dropped someone off in a "distant part of the parking lot" and that person later ran back to the area where the car was located.

Metropolitan Officer Jimmy Gregg testified that on October 31, 2009, he was "asked to respond to a dark Mustang on Murfreesboro Road." Officer Gregg got behind the vehicle and activated his emergency lights. The vehicle drove into the parking lot of a coin laundry. Officer Gregg activated a spotlight and directed it toward the back window of the Mustang. He said, "I could see a male in the back behind the passenger seat taking off a – bandanna around from his . . . nose and face area." Officer Gregg said that the bandanna was blue. He identified the appellant as the man who was wearing the bandanna. Officer Gregg recalled that the driver of the Mustang was a female named Jasmine Crook.

Detective Gregory Jennings testified that on October 31, 2009, he was informed that the appellant had been arrested. Detective Jennings responded to the laundromat on Murfreesboro Road, looked in the car, and saw a blue bandanna in the backseat. Detective

Jennings read the appellant his Miranda rights, but the appellant did not give a statement.

In his defense, the appellant submitted "certified copies of [three additional theft] convictions of Ms. Cunningham" to impeach her credibility as a witness. The appellant presented no witnesses.

The jury found the appellant guilty of one count of especially aggravated robbery and two counts of fraudulent use of a credit card. On appeal, the appellant challenges the sufficiency of the evidence supporting his convictions and the sentences imposed by the trial court.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant complains that there was no physical evidence to tie him to the crimes except a blue bandanna that was not forensically tested by police. Further, he contends that "witnesses for the State who came forward to give statements and assistance to the police were either inconsistent or unreliable. Ms. Goodner and Ms. Cunningham both were not entirely honest both with the police and in court."

First, we will address the appellant's conviction of especially aggravated robbery, which is defined as robbery accomplished with a deadly weapon where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a)(1) and (2). Aggravated robbery is defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. Tenn. Code Ann.

-6-

§ 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103. Serious bodily injury is defined as a bodily injury that involves:

> (A) A substantial risk of death;
>
> (B) Protracted unconsciousness;
>
> (C) Extreme physical pain;
>
> (D) Protracted or obvious disfigurement;
>
> (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or
>
> (F) A broken bone of a child who is eight (8) years of age or less

Tenn. Code Ann. § 39-11-106(a)(34); see also State v. Michael Farmer, __ S.W.3d __, No. W2009-02281-SC-R11-CD, 2012 WL 3594242, at *4-5 (Tenn. Crim. App. at Nashville, Aug. 22, 2012).

Our review of the record reveals that the victim, Todd, and Gregory were talking in the Target parking lot when a man approached, stabbed the victim in the back, and took her purse. Although the perpetrator wore a blue bandanna covering the bottom of his face, Gregory was later able to identify the appellant as the perpetrator. Todd saw the perpetrator flee and get into a dark-colored Mustang. Detective Peterson retrieved video footage from Target's security cameras and released the footage of the vehicle to the media. Upon seeing the footage on the news, Cunningham called Detective Peterson and said that she recognized the car. Goodner also recognized the car, which belonged to her. Goodner said that she had loaned the car to Jasmine Crook, the appellant's girlfriend. Later, Officer Gregory pursued the Mustang and saw the appellant in the backseat, taking off a blue bandanna.

Immediately after the stabbing, the victim experienced a "dull pain" which progressed until she was "in too much pain" to move without assistance. The victim said that she was in "agony" and that she was hospitalized for three days. The hospital record show that she was given morphine, oxycontin, and other strong pain relievers. At the hospital, the victim learned that the stab wound was eight inches deep and had lacerated her kidney. She said

that her kidney was "[w]orking fine [at the time of trial, but] it was not working fine right away." Further, she said that she had a scar on her back, which she showed to the jury. We conclude that the evidence was sufficient to sustain the appellant's conviction of especially aggravated robbery.

Turning to the appellant's remaining convictions, Tennessee Code Annotated section 39-14-118(b)(1) provides that "[a] person commits the crime of fraudulent use of a credit or debit card who uses, or allows to be used, a credit or debit card or information from that card, for the purpose of obtaining property, credit, services or anything else of value with knowledge that . . . [t]he card is forged or stolen." Tennessee Code Annotated section 39-14-118(c)(1) provides that "[f]raudulent use of a credit or debit card is punishable as theft pursuant to § 39-14-105, depending on the amount of property, credit, goods or services obtained"; otherwise, subsection (c)(2) provides that "[i]f no property, credit, goods, or services are actually received or obtained, illegal possession or fraudulent use of a credit card is a Class A misdemeanor."

The victim stated that after her purse was stolen, she cancelled the credit cards that were in her purse. She learned that her credit card had been used four times the day after her purse was stolen: once at an Exxon gas station, twice at a Fancy Nails salon, and once at a Krystal's restaurant. Additionally, on the night of the stabbing, there was an attempted use of her credit card on John E. Merritt Boulevard. Video footage obtained by Detective Peterson depicted a black female at the Exxon gas station paying for gas for a dark blue Mustang. Goodner testified that she, her mother, and the appellant's girlfriend Crook went to Fancy Nails; Goodner and Crook each used a credit card to pay for services. Goodner acknowledged that she knew the credit card was stolen. Although the appellant questions the credibility of Crook and Goodner, we note that determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). We conclude that there was sufficient evidence for the jury to find that the appellant stole the credit card and that he allowed Goodner and Crook to use the stolen credit card.[1]

_____

[1]The trial court's minutes from January 28, 2011, reflect that the court granted an oral motion to sever the offenses and noted that trial would proceed on counts 3, 4, and 5. Likewise, the trial court's sentencing order noted that "Counts 3-5 of the original indictment were tried as Counts 1, 2, and 3 during this trial for the purpose of the jury. Counts 1 and 2 and 6-9 were severed to be tried separately." The judgments of conviction reflect that the appellant was found guilty on counts 3, 4, and 5. However, the court's minutes from March 22, 2011, reflect that the jury found the appellant "guilty as to count one
(continued...)

B.  Sentencing

Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness.  See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'"  State v. Susan Renee Bise, __ S.W.3d __, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *19 (Tenn. Crim. App. at Knoxville, Sept. 26, 2012).  In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment.  See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, __ S.W.3d __, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *11.  The burden is on the appellant to demonstrate the impropriety of his sentence.  See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

The trial court should also consider enhancement and mitigating factors; however, the statutory enhancement factors are advisory only.  See Tenn. Code Ann. § 40-35-114; see also Bise, __ S.W.3d __, No. E2011-00005-SC-R11-CD, 2012 WL 4380564, at *11; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008).  Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion."  Carter, 254 S.W.3d at 345.  In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'"  Id. at 343.  "[A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence."  Id. at 345-46. "[They are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act."  Id. at 346.

The appellant alleges that the sentences imposed by the trial court were excessive. However, as the State correctly notes, the appellant waived this issue by failing to include a transcript of the sentencing hearing.  It is well-established that "[w]hen a party seeks

_____

[1](...continued)
especially aggravated robbery[] and counts two and three fraudulent use of [a] credit card."

appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993); see also Tenn. R. App. P. 24(b); Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). "In the absence of an adequate record on appeal, this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). Without the transcript of the sentencing hearing, we are unable to perform a de novo review of the appellant's sentencing issues, and we presume the trial court correctly sentenced the appellant.

### III. Conclusion

In sum, we conclude that there is sufficient evidence to sustain the appellant's convictions and that the trial court did not err in sentencing the appellant. Therefore, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE